**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2415**

PERINI/TOMPKINS JOINT VENTURE,

Plaintiff – Appellant,

v.

ACE AMERICAN INSURANCE COMPANY,

Defendant – Appellee.

-------------------------------

ASSOCIATED GENERAL CONTRACTORS OF AMERICA; MARYLAND CHAPTER
OF THE ASSOCIATED GENERAL CONTRACTORS OF AMERICA,

Amici Supporting Appellant.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.   Peter J. Messitte, Senior District
Judge.  (8:10-cv-03494-PJM)

Argued: October 30, 2013          Decided:  December 16, 2013

Before SHEDD and THACKER, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

Affirmed by published opinion.  Judge Thacker wrote the opinion,
in which Judge Shedd and Senior Judge Hamilton joined.

**ARGUED**: Gregory David Podolak, SAXE DOERNBERGER & VITA, P.C.,
Hamden, Connecticut, for Appellant.  Joseph K. Powers, SEDGWICK
LLP, New York, New York, for Appellee.  **ON BRIEF**: Tracy A. Saxe,

SAXE DOERNBERGER & VITA, P.C., Hamden, Connecticut, for Appellant. Timothy D. Kevane, SEDGWICK LLP, New York, New York, for Appellee. Joseph C. Kovars, OBER, KALER, GRIMES & SHRIVER, Baltimore, Maryland; Patrick J. Wielinski, COKINOS, BOSIEN & YOUNG, Irving, Texas, for Amici Supporting Appellant.

THACKER, Circuit Judge:

Perini/Tompkins Joint Venture ("PTJV" or "Appellant") appeals the district court's grant of summary judgment in favor of ACE American Insurance Co. ("ACE" or "Appellee"). PTJV filed suit, claiming coverage under primary and excess insurance policies with regard to a large-scale construction project in Oxon Hill, Maryland. The district court determined ACE was entitled to summary judgment because PTJV did not obtain ACE's consent before settling the underlying dispute regarding property damage at the construction site and, pursuant to the insurance contract, PTJV was required to do so at the risk of relinquishing coverage. We hold that under Maryland and Tennessee law, PTJV violated the terms of both the primary and excess policies by not obtaining ACE's consent before settlement, and as such, cannot now claim reimbursement under those policies. We thus affirm the district court.

I.

A.

The Project

In 2005, Gaylord National LLC ("Gaylord") hired PTJV, a joint venture between the Perini Building Company and Turner Construction Company, to serve as manager in connection with the construction of a $900 million hotel and convention center in Oxon Hill, Maryland (the "Project"). As part of the

3

construction contract between PTJV and Gaylord (the "Contract"), Gaylord agreed to purchase and maintain an Owner Controlled Insurance Program ("OCIP"), which was a program crafted and sold by ACE to insure only the Project and its participants.

Gaylord then purchased from ACE an OCIP Commercial General Liability Insurance Policy (the "Primary Policy"), providing a limit of $2 million per occurrence, and an OCIP Excess Liability Policy (the "Excess Policy"), providing a limit of $25 million per occurrence (collectively, the "Policies"). The Policies provided coverage for the period from May 23, 2005, to August 30, 2008. By endorsement, PTJV was added as a named insured on the Policies. The Project was also insured by a Builders Risk Policy through Factory Mutual Insurance Company ("FM Global").

During construction of the signature feature of the building -- an 18-story, 2,400 ton glass atrium -- serious property damage occurred. The damage is described in the Complaint as follows:

10. A significant portion of the Project involved the construction of a glass roof atrium. The atrium was composed of numerous subsections, called trusses, that were preassembled on the ground and lifted via crane into place. Each truss contained several components, including supportive tension rods that were connected by rod/clevis junctures.

11. The atrium was under construction on or about August 28, 2007 while Truss H4 was lifted into position and, on or about August 31, 2007, certain

4

components were added to the atrium that placed additional pressure and tension on Truss H4, causing, unbeknownst to either Gaylord or PTJV, one of the rod/clevis junctures on Truss H4 to slowly erode.

12. On September 5, 2007, the rod/clevis juncture on Truss H4, which began eroding no later than August 31, 2007, failed. That failure caused a loss of tension that substantially impaired the structural integrity of the atrium (the "Collapse").

13. The Collapse caused damage to various components of the Project and required a temporary suspension of the Project and such damages were neither expected nor intended from the standpoint of PTJV.

J.A. 21.[1]  A representative from ACE was on site at the Project at the time of the Collapse and thereafter.  The Project was scheduled to be completed in December 2007, but due to various delays (including the Collapse), the completion date was pushed to March 2008.

B.

The Underlying Litigation

After the Project was completed, litigation ensued. On September 18, 2008, PTJV filed a complaint against Gaylord for establishment and enforcement of a mechanic's lien, breach of contract, quantum meruit, and violation of the Maryland Prompt Payment Act.  See Perini/Tompkins Joint Venture, et al. v. Gaylord Nat'l, LLC, No. CAE08-24316 (Cir. Ct. Md. Sept. 18,

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

2008) (the "PTJV action"). PTJV alleged Gaylord still owed $79,656,098 under the Contract and asked for damages plus interest, costs, and fees. The claims were based on the costs allegedly incurred due to Gaylord's late delivery of the Project designs and its alleged changes to the original scope of the work.

Subsequently, on October 10, 2008, Gaylord countersued, filing a complaint against PTJV for breach of contract and breach of fiduciary duty. See Gaylord Nat'l, LLC v. Perini/Tompkins Joint Venture, No. CAE08-27201 (Cir. Ct. Md. Oct. 10, 2008) (the "Gaylord action"). Gaylord claimed PTJV failed to properly manage scheduling, costs, and budgets, and failed to build a high-quality project at the agreed-upon price. Specifically, Gaylord alleged it paid PTJV $802,085,712, when it should have only paid $737,091,338. Thus, Gaylord sought reimbursement of approximately $65 million in damages resulting from the alleged overpayment. Notably, PTJV did not notify ACE of the Gaylord action.

Gaylord and PTJV settled the Gaylord action on November 26, 2008.[2] Gaylord paid an additional $42,301,875 (for

---

[2] Gaylord filed a motion to consolidate the PTJV action and the Gaylord action in circuit court on November 6, 2008, but it does not appear the motion was ever ruled upon. The PTJV action was dismissed by stipulation on January 23, 2009.

a total of almost $845 million) and PTJV credited $26,157,912 back to Gaylord. Crucial to this appeal, PTJV never sought to obtain ACE's consent prior to entering into this settlement.

C.

The Coverage Litigation

On May 6, 2009, almost six months after the settlement and nearly two years after the Collapse, PTJV sent a letter to ACE advising that, to the extent FM Global did not pay the claim related to the Collapse, PTJV intended to seek reimbursement from ACE. This letter was the first formal, written notice of a claim to ACE, although ACE concedes its representative was present on the site when the Collapse occurred. However, this letter did not mention the settlement or the Gaylord action at all. Over ten months later, on February 23, 2010, ACE issued a reservation of rights letter, citing "[b]usiness [r]isk" exclusions, late notice, and voluntary payments made without ACE's consent as potential grounds for denial of coverage. On April 29, 2010, FM Global denied PTJV's claims.

After several additional months of back-and-forth between PTJV and ACE, on December 13, 2010, PTJV filed suit against ACE in the United States District Court for the District of Maryland, alleging

> (1) Count One: breach of contract/bad faith/implied covenant of good faith and fair dealing (ACE "refused and/or neglected to pay any

7

portion of the [c]laims [regarding the Collapse] pursuant to the Primary Policy or the Excess Policy and is in breach of its contractual obligations to PTJV.");

(2) Count Two: a declaratory judgment "to determine the rights and duties of PTJV and ACE pursuant to the Primary Policy and the Excess Policy"; and

(3) Count Three: bad faith under Tennessee law based on, inter alia, ACE "intentionally and/or recklessly t[aking] direction from another named insured to deny PTJV's claim," and "engag[ing] in unwarranted delay tactics."

J.A. 13-15.

ACE filed a motion to dismiss on February 15, 2011, and the district court denied the motion in part on September 1, 2011, but ordered that limited discovery be conducted on issues regarding late notice to ACE, including any corresponding prejudice. After discovery, ACE filed a summary judgment motion on August 17, 2012. The district court held oral argument on October 22, 2012, and orally granted summary judgment in favor of ACE. The district court explained,

> [It] really is not disputed that . . . the settlement occurred without consent.
>
> . . .
>
> What's clear is that the defendant was not given an opportunity to enter into settlement negotiations in any way to determine whether the concessions that were being made by the . . . plaintiff in this case were in any way reasonable, whether there was any collusion because there were other claims going back and

8

> forth, and this carrier clearly did not involve itself.
>
> . . .
>
> [T]he Court is prepared to find that there is a reasonable dispute as to notice of the occurrence and even arguably as to notice of claim. The problem here is with the notice of settlement. Now, the Court feels as a matter of law, the defendant . . . w[as] entitled to notice of the settlement negotiations to intervene, to investigate, to challenge[.]"

J.A. 88-89, 92. A formal order issued the next day, October 23, 2012, granting summary judgment for the reasons stated on the record at the hearing. This timely appeal followed.

## II.

Before we proceed to the merits of this appeal, we first decide the proper law to apply. A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits. See Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418–19 (4th Cir. 2004). In this diversity action, the district court was correct in applying Maryland's choice of law rules. See CACI Int'l, Inc. v. St. Paul Fire and Marine Ins. Co., 566 F.3d 150, 154 (4th Cir. 2009) ("Because we have diversity jurisdiction in this case, we apply the choice of law rules of the forum state . . . .").

In insurance contract disputes, Maryland follows the principle of lex loci contractus, which applies the law of the

9

jurisdiction where the contract was made. <u>Allstate Ins. Co. v.</u> <u>Hart</u>, 611 A.2d 100, 101 (Md. 1992). For choice of law purposes, a contract is made where "the last act is performed which makes the agreement a binding contract. Typically, this is where the policy is delivered and the premiums are paid." <u>Sting Sec.,</u> <u>Inc. v. First Mercury Syndicate, Inc.</u>, 791 F. Supp. 555, 558 (D. Md. 1992) (internal quotation marks, citations, and alteration omitted). In this case, that state is Tennessee.[3]

Under certain circumstances, however, Maryland choice of law rules follow the <u>renvoi</u> doctrine, an exception to the <u>lex</u> <u>loci</u> <u>contractus</u> rule. Under this exception, a Maryland court may disregard the rule of <u>lex</u> <u>loci</u> <u>contractus</u> and apply Maryland law, if

> 1) Maryland has the most significant relationship, or, at least, a substantial relationship with respect to the contract issue presented; and

> 2) The state where the contract was entered into would not apply its own substantive law, but instead would

---

[3] Gaylord, the sponsor of the Policies, has its principal place of business in Nashville, Tennessee. The Policies were issued to Gaylord, whose address is listed on the Policies as being in Nashville, Tennessee. The broker who procured the Policies is Willis of Tennessee, Inc., with an address in Nashville, Tennessee. All of the "services offered by Willis of Tennessee in connection with the procurement of the Policies were performed out of [the] Nashville, Tennessee office." J.A. 51. Additionally, the policies were delivered to and were received by both Gaylord and Willis in Tennessee and Gaylord forwarded payment for the Policies' premiums from its offices in Tennessee.

10

apply Maryland substantive law to the issue before the court.

See Am. Motorists Ins. Co. v. ARTRA Group, Inc., 659 A.2d 1295, 1304 (Md. 1995).

We recognize, however, "[c]hoice of law analysis becomes necessary . . . only if the relevant laws of the different states lead to different outcomes" and where the laws "do not so conflict, the choice is immaterial, and the law of the forum -- Maryland -- governs." Lowry's Reports, Inc. v. Legg Mason, Inc., 271 F. Supp. 2d 737, 750 (D. Md. 2003)); see also Int'l Adm'rs, Inc. v. Life Ins. Co. of N. Am., 753 F.2d 1373, 1376 n.4 (7th Cir. 1985) ("Conflicts rules are appealed to only when a difference in law will make a difference to the outcome."). As explained below, under either Tennessee or Maryland law, the outcome is the same.

III.

We review a district court's grant of summary judgment de novo. See Francis v. Allstate Ins. Co., 709 F.3d 362, 366 (4th Cir. 2013). We also review de novo a district court's decision on an issue of contract interpretation. See Seabulk Offshore Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 418 (4th Cir. 2004). Summary judgment is appropriate "only if . . . 'there is no genuine issue of material fact and that the moving

party is entitled to a judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)).

A.

The Policies

In essence, this is a simple contract interpretation case. See Rouse v. Fed. Ins. Co., 991 F. Supp. 460, 465 (D. Md. 1998) ("It is axiomatic that an insurance contract is interpreted like any other contract. If the policy's language is clear and unambiguous, the Court will assume the parties meant what they said . . . ." (citations omitted)). As with any contractual dispute, we start with the relevant policy provisions. See Prince George's Cnty. v. Local Gov't Ins. Trust, 879 A.2d 81, 88 (Md. 2005) ("In interpreting an insurance policy, as with any contract, the primary task of the circuit court is to apply the terms of the policy itself.").

The Primary Policy contains the following provisions:

(1) Right and duty to defend clause: "We will have the right and duty to defend the insured against any 'suit' seeking [property] damages. . . . We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result[.] . . . Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgment or settlements . . . ." J.A. 305, 310.

(2) Voluntary payment clause: "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." J.A. 314.

12

(3) No-action clause: "No person or organization has a right under this Coverage Part: . . . [t]o sue us on this Coverage Part unless all of its terms have been fully complied with.  A person or organization may sue us to recover on an agreed settlement . . . .  An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative." J.A. 314.

The Excess Policy likewise contains similar duty to defend, voluntary payment, and no-action clauses.  See J.A. 377-378.

B.

Maryland Law

1.

Statutory Law

Section 19-110 of the Maryland Code provides,

An insurer may disclaim coverage on a liability insurance policy on the ground that the insured or a person claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

Md. Code Ann. § 19-110 (emphasis added).  PTJV relies heavily on this statute and argues that ACE's denial of coverage centers on PTJV's alleged "lack of notice" of the claim regarding the Collapse and "lack of cooperation" in PTJV's failure to notify ACE of the Gaylord claim and settlement.  As such, it contends, ACE must show actual prejudice before denying coverage, which is an issue of fact that should survive summary judgment.

13

ACE, in contrast, maintains that regardless of whether PTJV provided them with timely notice of the claim (or whether they had constructive knowledge through their on-site representative), there is no dispute that PTJV did not obtain ACE's consent before settlement, in violation of the voluntary payment and no-action clauses. ACE argues prejudice is irrelevant in this instance, but even if ACE were required to show prejudice, we should infer prejudice as a matter of law because "ACE was left in the dark during the pendency of the underlying litigation and the negotiations leading to the finalization of the settlement," and otherwise, ACE will be "placed in the impossible position of having to prove a negative . . . ." Appellee's Br. 19.

We agree with ACE that "[t]he central issue in this appeal is whether the insured . . . can unilaterally settle a construction defect case . . . , present the settlement to its liability insurer as a fait accompli, and obtain indemnification despite its blatant breach of clear and unambiguous policy provisions." Appellee's Br. 1.

We find Phillips Way, Inc. v. American Equity Insurance Co. to be particularly instructive in dissecting this case. See 795 A.2d 216 (Md. Ct. Spec. App. 2002). There, Phillips Way, a construction company, contracted to design and construct a clubhouse for the University of Maryland. See id.

14

at 217. During the course of the construction, several architectural and design defects arose, and Phillips Way decided to settle complaints about these problems to the tune of $260,000, without notifying its insurance carrier, American Equity. Once the project had been accepted by the University, Phillips Way made a claim against American Equity for $260,000. See id. at 217-18. The contract between American Equity and Phillips Way contained a no-action clause which stated, in relevant part,

> No action shall be maintained against the Company by the Insured to recover for any loss under this Insurance Policy unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms and conditions of this Insurance Policy, nor until the amount of such loss has been fixed or rendered certain by . . . agreement between the parties with the written consent of the Company.

Id. at 216-17.

Just like PTJV in this case, Phillips Way argued that Md. Code. Ann. § 19-110 applied, and as such, American Equity was required to show they were prejudiced by its failure to obtain consent before settlement. But the Court of Special Appeals held that section 19-110 should not be read to be "applicable to any defense raised by the insurer." 795 A.2d at 219. Specifically, it explained section 19-110 was "inapplicable when an insurer defends on the basis that its

15

insured failed to meet the condition precedent set forth in a no-action clause . . . ." Id. at 221. It continued,

> From the perspective of the insurer, one of the main purposes of a no action clause is to protect it from collusive or overly generous or unnecessary settlements by the insured at the expense of the insurer. That last-mentioned purpose would be difficult to accomplish if an insured could disregard the no-action clause, sue its insurer, and put the nearly impossible burden on the latter of showing collusion or demonstrating, after the fact, the true worth of the settled claim.

Id. at 220-21 (internal quotation marks omitted).

Phillips Way is directly applicable to the case at hand. The no-action clause in this case states that the insured cannot sue under the Policies "unless all of its terms have been fully complied with." J.A. 314 (emphasis added). It also states that PTJV can sue to recover on a settlement only if the "settlement and release of liability" is "signed by [ACE]." Id. The voluntary payment clause requires ACE's consent before "voluntarily mak[ing] a payment, assum[ing] any obligation, or incur[ring] any expense," at the risk of relinquishing coverage. J.A. 314. These are conditions precedent to PTJV's ability to obtain coverage, that is, "fact[s], other than mere lapse of time, which, unless executed, must exist or occur before a duty of immediate performance of a promise arises." Chirichella v. Erwin, 310 A.2d 555, 557 (Md. 1973) (internal quotation marks omitted). "[W]here a contractual duty is subject to a condition

16

precedent, whether express or implied, there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed or excused." Laurel Race Course, Inc. v. Regal Constr. Co., 333 A.2d 319, 327 (Md. 1975).

ACE advances the same argument as the one in play in Phillips Way: because PTJV did not meet the condition precedent in the no-action clause (that is, it did not obtain consent before settlement), it cannot now sue ACE. Phillips Way directly vindicates this argument. Indeed, it is undisputed that PTJV did not obtain ACE's consent to settlement before settling with Gaylord. Thus, PTJV cannot satisfy the conditions precedent of the voluntary payment and no-action clauses, as they "attempt[ed] to settle" and "voluntarily ma[d]e a payment" "without [ACE's] consent," (voluntary payment clause) and did not ensure the "settlement and release of liability [was] signed by [ACE]" (no-action clause). J.A. 314, 378. The no-action clause also states PTJV has no right to sue "unless all of [the Policies'] terms have been fully complied with," and as explained above, PTJV did not comply with all of the Policies' terms.

We also note that, to the extent PTJV argues the voluntary payment and no-contest clauses are implicated by section 19-110's "lack of cooperation and notice" provisions,

17

Phillips Way rightly rejected that argument. See Phillips Way, 795 A.2d at 218 (Even "if [the insured] had notified [the insurer] of the intended settlement and gave the latter its full cooperation, the condition precedent would still have been breached if [the insurer] failed to give its written consent to that settlement."); id. at 220 (stating, "an insurer must show prejudice only if it raises a failure to cooperate defense or a defense based on lack of notice," and distinguishing cooperation and notice clauses from no-action clauses because cooperation and notice clauses "are contained in separate paragraphs from the 'no-action' clause," and in no-action clauses, usually "the amount of liability, as well as the issue of liability, must both have been determined" (internal quotation marks omitted)); see also J.A. 314 (Primary Policy, no-contest and voluntary payment clauses separate from notice and cooperation clauses), 378 (Excess Policy, same).

Therefore, because section 19-110 does not apply here, there is no statutory ground requiring ACE to show prejudice. Nonetheless, PTJV urges us to find that ACE must yet show prejudice under Maryland common law. As explained next, however, even if this were a correct statement of the law, prejudice can be inferred as a matter of law.

18

## 2.

## Common Law

PTJV and amici in this case argue that even if there is no statutory mandate that ACE show prejudice, ACE is still required to do so under common law. We disagree and read Phillips Way broadly as holding that an insured's failure to obtain the insurer's prior consent to a settlement does not ever require prejudice, primarily because -- whether statutory-based or common law-based -- an insurer would always have "the impossible burden . . . of showing collusion or demonstrating, after the fact, the true worth of the settled claim." 795 A.2d at 221.

But even assuming ACE were required to show prejudice outside the ambit of section 19-110, we would be obliged to conclude ACE was prejudiced as a matter of law. In Prince George's County v. Local Gov't Ins. Trust, the Maryland Court of Appeals held that a trust, acting as an excess liability insurer, was prejudiced as a matter of law when it was not notified of a claim until after its resolution. See 879 A.2d 81 (Md. 2005). The court explained,

> [T]he insured has presented the insurer with a fait accompli by delaying notice until after the judgment. The delay vitiates the purpose of the contractual notice requirement, as the insurer cannot exercise any of its rights to investigate, defend, control, or settle the suit. Accordingly, courts have held that the insurer is prejudiced as a matter of law. . . .

19

> By failing to notify the [insurer] of the incident, claim, and lawsuit until after the judgment, the [insured] nullified unilaterally all of the [insurer]'s rights and presented the [insurer] with a <u>fait</u> <u>accompli</u>. . . .
>
> [The insured] put the [insurer] in a position of proving a negative and speculating about what could have been. The [insurer] need not speculate. By itself, the abrogation of all of the [insurer's] contractual rights constituted prejudice. We hold that the [insurer] was prejudiced as a matter of law when the [insured] failed to notify the [insurer] of the incident, claim, and lawsuit until after an adverse judgment was entered.

<u>Id.</u> at 98, 100.[4]  We see no reason why this case -- wherein the insured actually paid a settlement, thereby cutting off the insurer's right to "investigate, defend, control, or settle" a suit -- commands a result different from <u>Prince George's County</u>. 879 A.2d at 98.

We would therefore affirm the district court's decision under Maryland law, regardless of whether prejudice is required.

---

[4] We have also had occasion to address this issue in the recent past. In <u>Minn. Lawyers Mut. v. Baylor & Jackson PPLC</u> ("MLM"), --- F. App'x ----, No. 12-1581, 2013 WL 3215246 (4th Cir. June 27, 2013), we concluded that under Maryland law, a professional liability insurer was prejudiced when a law firm failed to provide timely notice of a claim and MLM had "the exclusive right to investigate, negotiate and defend CLAIMS seeking DAMAGES against the INSURED." 2013 WL 3215246 at *7. We explained, "[b]y the time MLM received notice of a possible claim, the harm supporting the malpractice judgment was irreversible." <u>Id.</u>

20

C.

Tennessee Law

We would also affirm the district court's judgment under Tennessee law. First and foremost, the Court of Appeals of Tennessee has stated, "Contracts of insurance, like other contracts, are to be construed according to the sense and meaning of the terms which the parties have used, and if they are clear and unambiguous, their terms are to be taken and understood in their plain, ordinary, and popular sense." Jones Masonry, Inc. v. W. Am. Ins. Co., 768 S.W.2d 686, 687 (Tenn. Ct. App. 1988).

In Anderson v. Dudley Moore Insurance Co., the Tennessee Court of Appeals held that when an insurance agency failed to process paperwork for a potential insured and then paid a settlement to the insured without notifying their errors and omissions ("e&o") carrier, the agency could not recover from the e&o carrier because it violated the voluntary payment clause. See 640 S.W.2d 556 (Tenn. Ct. App. 1982). The court explained, "Although [the e&o carrier] had notice of a potential demand, plaintiff never made any formal request that the carrier investigate, defend, or pay the claim until long after it had made the ex parte payment to [the insured]," and this "was in express violation of the [voluntary payment] provision[]." Id. at 560. The court also rejected the notion that the voluntary

21

payment clause "relate[d] only to disbursements involving expenses of litigation and investigation," explaining that if this were true, "an insured with 'e&o' coverage could determine what sums to pay when a claim is made and thereafter make demand upon the carrier for reimbursement without the carrier having any input in the process. Such a construction would be extremely illogical and unreasonably restrictive." Id. Furthermore, "it would require that the express words contained in the agreement be ignored." Id.

Similarly, in State Auto. Ins. Co. v. Lashlee-Rich, the Court of Appeals of Tennessee held an insured that violated a voluntary payment clause in an insurance policy was precluded from claiming coverage under that policy. See No. 02A01-9703-CH-71, 1997 WL 781896 (Tenn. Ct. App. 1997). In that case, a construction company (Lashlee-Rich) accidentally hit an electrical wire while doing construction work, putting a nearby ice cream toppings business in peril of losing its inventory. Lashlee-Rich quickly contracted with an electric company to perform the necessary repairs and then sought to collect reimbursement from State Auto, its insurer. Although Lashlee-Rich notified State Auto of the occurrence the following day, it did not mention that it had assumed an obligation to pay the electric company. The insurance contract in that case, like in

22

the case at hand, contained a voluntary payment clause and a no-action clause. See id. at *2-3.

The court held, "Lashlee attempted to bypass the plain, unambiguous language in the insurance contracts and thereby divest State Auto of its rights to oversee the handling of any claim." Lashlee-Rich, 1997 WL 781896 at *4. In so doing, "undoubtedly, Lashlee-Rich violated the clear language of the policies by assuming an obligation, voluntarily making a payment and incurring an expense without State Auto's consent. Lashlee-Rich did all of the foregoing to their own peril." Id. at *5.

This case is similar to both Anderson and Lashlee-Rich. Here, PTJV took matters into its own hands, admittedly without obtaining consent from ACE, which divested ACE of its rights under the Policies, and violated the terms of such Policies.

As for prejudice, PTJV points to Alcazar v. Hayes, a landmark case in which Tennessee adopted the following policy:

> [O]nce it is determined that the insured has failed to provide timely notice in accordance with the insurance policy, it is presumed that the insurer has been prejudiced by the breach. The insured, however, may rebut this presumption by proffering competent evidence that the insurer was not prejudiced by the insured's delay.

982 S.W.2d 845, 856 (Tenn. 1998). However, Alcazar did not address situations of fait accompli, which we have here and

23

which were present in Anderson and Lashlee-Rich. Thus, those holdings -- which did not even factor prejudice into the equation -- still remain good law. Therefore, we predict the highest court in Tennessee would likewise resolve the case at hand under Anderson and Lashlee-Rich, without requiring ACE to demonstrate prejudice.[5]

We would therefore affirm summary judgment under Tennessee law as well.

---

[5] In its reply brief, PTJV cites a 2005 Tennessee case for the proposition that Alcazar extends to cases such as the one at hand, but that case does not deal with a fait accompli situation. See Appellant's Rep. Br. 20 (citing Smith & Nephew v. Fed. Ins. Co., No. 02-2455, 2005 WL 3434819, at *3 (W. D. Tenn. Dec. 12, 2005)). First of all, the Smith & Nephew case PTJV cites (a clarification order regarding fees) explicitly states that Alcazar deals with a breach of a "notice provision." Smith & Nephew, 2005 WL 3434819, at *3. As explained above, this case is about consent to settlement, not notice. In addition, a closer examination of facts set forth in the earlier Smith & Nephew opinion reveals that the insured provided notice of litigation early on, but the insurer declined to get involved. After this notice was given, the insured settled the case, and the insurer did not consent to "fees and expenses" incurred by the insured. Smith & Nephew v. Fed. Ins. Co., No. 02-2455, 2005 WL 3134053, at *3 (W.D. Tenn. Nov. 23, 2005). Thus, in Tennessee, there is a distinct difference between an insurer being provided late notice while litigation is ongoing or has not yet begun, and being surprised with a claim for settlement reimbursement after the matter has already been resolved.

24

D.

Waiver

PTJV argues ACE "waived [its] late notice/voluntary payment defense," or at least, this is an issue of fact that should survive summary judgment. Appellant's Br. 56. It contends "ACE consistently turned a blind eye to the Atrium Failure, ignored PTJV's claim for unreasonably long periods of time and even went so far as to tell PTJV it would pay the claim." Id. at 57.

Under Maryland and Tennessee law, a waiver requires the "intentional relinquishment of a known right existing for the benefit of the insurer." Gov't Emps. Ins. Co. v. Group Hosp. Med. Servs., Inc., 589 A.2d 464, 466 (Md. 1991) (internal quotation marks omitted); see also Kentucky Nat. Ins. Co. v. Gardner, 6 S.W.3d 493, 498-99 (Tenn. Ct. App. 1999) ("A waiver is an intentional relinquishment of a known right."). PTJV bears the burden of showing that ACE's conduct is "so clearly inconsistent" with any intention to enforce the provision at issue "that the conduct constitutes an implied waiver." Kentucky Nat., 6 S.W.3d at 499; see also Springfield Tobacco Redryers Corp. v. City of Springfield, 293 S.W.2d 189, 199 (Tenn. Ct. App. 1956) (waiver must be proven by a "clear, unequivocal and decisive act . . . showing such a purpose, or

25

acts amounting to an estoppel" (internal quotation marks omitted)).

PTJV submits that ACE did the following things, which should constitute waiver or at least raise a genuine issue of material fact:  (1) ACE "ignored" the atrium failure (i.e., did not "take any action" after the Collapse); (2) ACE "failed to acknowledge PTJV's claim for 10 months"; (3) ACE "represented to PTJV that it would pay the claim," without reserving rights; and (4) ACE "refused to pay, but not on the basis of late notice." Appellant's Br. 55-59.

However, none of these facts shows ACE's "intentional relinquishment" of its right to invoke the provisions of the no-action and voluntary payment clauses, which as explained above, are the relevant provisions to this appeal.  In fact, in the September 8, 2010 letter from ACE offering to pay a certain part of the claim, it stated it "is not waiving, nor will it be estopped from asserting any other terms, conditions, exclusions or provisions of this policy."  J.A. 2802.  For these reasons, PTJV's waiver argument fails.

IV.

For these reasons, the judgment of the district court is

AFFIRMED.

26