**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-2044

T.H.E. INSURANCE COMPANY,

Plaintiff – Appellee,

v.

MELYNDIA DAVIS; ROBERT SPENCER,

Defendants – Appellants,

and

ROBERT FISHER, d/b/a New Horizon Balloon Team; TODD PLANK, d/b/a New Horizon Balloon Team; MARY FISHER,

Defendants.

Appeal from the United States District Court for the District of Maryland, at Baltimore. George L. Russell III, District Judge.  (1:18-cv-03402-GLR)

Argued:  October 27, 2022              Decided:  December 9, 2022

Before KING and RUSHING, Circuit Judges, and TRAXLER, Senior Circuit Judge.

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Rushing and Senior Judge Traxler joined.

**ARGUED:** L. Steven Emmert, SYKES, BOURDON, AHERN & LEVY, PC, Virginia Beach, Virginia, for Appellants. Louis Howard Kozloff, KENNEDYS CMK, LLP, Philadelphia, Pennsylvania, for Appellee. **ON BRIEF:** Amanda C. Dure, Douglas P. Desjardins, PANGIA LAW GROUP, Washington, D.C., for Appellants. Megan T. Mantzavinos, MARKS, O'NEILL, O'BRIEN, DOHERTY & KELLY, P.C., Towson, Maryland; Thomas J. Seery, KENNEDYS CMK, LLP, Philadelphia, Pennsylvania, for Appellee.

_____

2

KING, Circuit Judge:

Appellants Melyndia Davis and Robert Spencer, who were maimed in a hot air balloon accident in southeastern Pennsylvania in 2015, pursue appellate challenges to the District of Maryland's rulings against them and in favor of T.H.E. Insurance Company (the "Insurer") in this insurance coverage dispute. In federal court proceedings initiated in 2016 in Maryland, Davis and Spencer sued certain of the Insurer's named insureds — that is, Robert Fisher, Todd Plank, and a business called New Horizon Balloon Team (collectively, the "Insureds") — for the gruesome injuries Davis and Spencer sustained in the balloon accident (the "damages lawsuit").

In 2018, while the damages lawsuit was pending, the Insurer initiated these insurance coverage proceedings in the Eastern District of Pennsylvania, naming as defendants the three Insureds, plus Davis and Spencer. Therein, the Insurer sought a declaratory judgment that Davis and Spencer were "passengers" at the time of the balloon accident under an insurance policy the Insurer had issued to the Insureds (the "Policy"). More specifically, the Insurer sought in the coverage proceedings a court ruling that the Policy's coverage limit of $100,000 per balloon passenger is applicable to Davis and Spencer, rather than the $1,000,000 coverage limit applicable to non-passengers.

In November 2018, the coverage proceedings were transferred from the Pennsylvania federal court to the District of Maryland. Those proceedings were then stayed pending resolution of the damages lawsuit, which was settled in August 2019. In October of that year, the Insurer filed an amended complaint against Davis and Spencer in the coverage proceedings, continuing to pursue — in light of the settlement agreement

3

executed in the damages lawsuit — a judgment that limited the Policy's coverage for the balloon's passengers to $100,000 each. Additionally, relying on settlement negotiations conducted in the damages lawsuit and other events relating to the Insurer's investigation of the balloon accident, Davis and Spencer lodged counterclaims in the coverage proceedings against the Insurer for contractual and statutory bad faith.

By its Memorandum Opinion of August 19, 2021, the district court awarded summary judgment in favor of the Insurer's contention with respect to a $100,000 coverage limit to each balloon passenger. *See T.H.E. Ins. Co. v. Fisher*, No. 1:18-cv-03402 (D. Md. Aug. 19, 2021), ECF No. 116. The Memorandum Opinion also rejected both of Davis and Spencer's bad faith claims. Davis and Spencer have appealed those rulings to this Court and, as explained herein, we affirm the district court.

I.

A.

Relevant here, the Insurer provided liability insurance coverage to the Insureds under the Policy, which is entitled "Hot Air Balloon Liability Coverage Form." *See* J.A. 31.[1] The Policy provides coverage for injuries and damages suffered from commercial hot air balloon flights by way of two mutually exclusive coverage provisions, each of which has its own monetary limit. "Coverage A" of the Policy is applicable to claims for bodily

---

[1] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in this appeal.

4

injury to persons other than passengers of a hot air balloon (i.e., non-passengers), and provides a coverage limit of $1,000,000 per occurrence. The Coverage A provision states in pertinent part that the Insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . sustained by any persons excluding any 'passenger' arising out of the 'operation of a Hot Air Balloon[.]'" *Id.* at 31. Meanwhile, "Coverage B" of the Policy is applicable to all claims for "bodily injury" to "passengers" of a commercial hot air balloon and limits the coverage of such passengers to only $100,000 per passenger. *Id.* at 32. Specifically, Coverage B provides that the Insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . sustained by any 'passenger' arising out of the 'operation of a Hot Air Balloon[.]'" *Id.*

Under the Policy, the term "passenger" is defined as "any person, other than the 'pilot in command,' in or entering the 'Hot Air Balloon' for the purpose of riding therein or alighting therefrom following a flight or attempted flight, or a crew member." *See* J.A. 48. The term "Operation of a Hot Air Balloon" means "all activities related to the preparation of a 'Hot Air Balloon' for flight, 'in flight' activities and the landing and repacking of the balloon." *Id.* The phrase "in flight" in the Policy "means that the 'Hot Air Balloon' shall be deemed to be in flight from the time of unpacking with the intention of inflation and flight, until the envelope is repacked including but not limited to tethered operations." *Id.* at 47. For its part, the term "Hot Air Balloon" is defined as all parts associated with such a balloon, including its "gondola" and "envelope." *Id.* at 46. The

5

"gondola" of a balloon is defined as the basket holding the pilot and passengers, and the "envelope" is the fabric suspension system that contains heated air to create lift. *Id.*

## B.

### 1.

Appellants Davis and Spencer were injured in a commercial hot air balloon accident that occurred on August 15, 2015 in Lancaster County, Pennsylvania, just north of the Maryland state line.[2] Near the end of a balloon flight piloted by the named insured Robert Fisher, the balloon descended for landing in a farm field. After initially touching ground and briefly lifting back into the air, the basket of the balloon — containing the pilot Fisher, plus passengers Davis and Spencer — was secured by the ground crew. Once the basket had touched back down, however, the balloon's so-called "vent line" — a rope that controls the opening and closing of the vent at the top of the balloon's envelope and, when open, allows hot air to escape from the envelope — became trapped under the balloon's basket, causing the vent line to remain open and the envelope to lose heat, deflate, and collapse.

Wind and gravity swiftly interacted to cause the hot air balloon's deflating envelope to move laterally and dangerously downward toward a nearby electric power line. Despite the ground crew's efforts at keeping the basket upright, it began tipping over. With Fisher, Davis, and Spencer yet inside the basket, Fisher grabbed the balloon's "top line" rope —

---

[2] We accept and recite the relevant facts — as the district court was obliged to do — in the light most favorable to Davis and Spencer, as the nonmoving parties with respect to the Insurer's summary judgment motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

which was attached to the top portion of the envelope — and gave it to a ground crew member so that the envelope could be pulled away from the nearby power line. But as Fisher sought to release the top line from a carabiner (a closed hook used to secure the top line), the deflating balloon envelope came into contact with the power line and Fisher felt an electrical shock. A ground crew member, Mr. Hart, was holding the basket at that point, and he also felt the electrical shock. Hart quickly let go of the basket, as it was tipping over onto its side. Because the balloon's envelope was in contact with the power line, electricity travelled from the power line through the balloon cables to metal components of the basket, passing through Davis and Spencer to the ground. As a result, Davis and Spencer suffered gruesome injuries from electrocution.[3]

2.

Fisher promptly reported the hot air balloon accident to his insurance agent. Fisher explained to the agent how the accident occurred, and he related that Davis and Spencer had each been severely injured by the electrical shock of the accident. On August 17, 2015, the agent reported the balloon accident to the Insurer's claims manager. The agent conveyed to the claims manager, Mr. Sutack, the information provided by Fisher, including the fact that Davis and Spencer were inside the balloon's basket at the time of their injuries.

---

[3] The balloon pilot Fisher, who is an insured under the Policy, also sustained injuries from the electrical shock. Fisher's injuries, however, were not as severe as those suffered by Davis and Spencer. After the electrical shock, Fisher was able to assist in extricating Davis and Spencer from the balloon's basket. Fisher was also able to later recall and testify about the disastrous events.

Sutack then opened claims for Davis and Spencer under Coverage B, setting reserves at

$100,000 per passenger.

Those claims were then assigned to the Insurer's senior claims specialist, Ms.

Fellows, who launched the Insurer's initial investigation into the balloon accident. As part

of her investigation, Fellows interviewed Fisher five days after the accident, on August 20,

2015. Fellows took handwritten notes of her conversation with Fisher, which reflect in

relevant part that:

> [t]he balloon was above light/limp fluttering. Then the balloon was electrocuted. Bob [Fisher] yelled fell out of basket. Basket layed [sic] over. . . . Passengers *still in basket* [and] on the ground. [Fisher] ran around basket. Grabbed female out of the basket. Came back to male. 200 [pounds] he tried pulling him out.

*See* J.A. 685-86 (emphasis added). Fellows then prepared a typed summary of her notes

that provides as follows:

> One of the crew yelled to Bob [Fisher] that the balloon was lax, so [Fisher] looked and noticed the balloon was loosing [sic] heat too quickly. When they had landing [sic] the vent line was caught under the basket. [Fisher] pulled the vent line free but the balloon was now limp and elongated and started to lean towards the [power] lines. [Fisher] and his passenger [sic] were shocked by the power line. [Fisher stated] that he felt it went on for 5 [seconds] or so and he came . . . to [the] male passenger who was breathing — the basket had fallen [over] during their shock *so they were all half way in and out of the basket*. He saw the female was not breathing. In panic and for safety, since there was live propane in the balloon [Fisher] pulled the lady 10 [feet] from the basket and send [sic] to retrieve the male who was heavier so a crew member assisted in moving the man.

*Id.* at 681 (emphasis added).[4]

---

[4] The National Transportation Safety Board (the "NTSB") conducted an investigation of the balloon accident. Its August 2016 report confirmed that Davis and (Continued)

Predicated upon Fisher's description of the accident, Ms. Fellows determined that Davis and Spencer were inside the balloon's basket and thus were "passengers" under the Policy when they were injured. *See* J.A. 676-77. After concluding that Coverage B applied to Davis and Spencer individually, Fellows sent correspondence to Fisher and advised him that the Policy's applicable coverage limit was $100,000 per passenger. On September 21, 2015, approximately a month after the balloon accident, the Insurer offered to pay Davis and Spencer the coverage limit provided by Coverage B — that is, $100,000 each. Davis and Spencer rejected that effort by the Insurer to resolve their injury and damages claims.

C.

In July 2016, Davis and Spencer filed the damages lawsuit in the District of Maryland against the Insureds, seeking a substantial damages award for the injuries they had sustained as a result of the balloon accident.[5] In response thereto, the Insureds lodged an interpleader claim in the damages lawsuit, seeking release of all claims in exchange for Coverage B's limit of $100,000 per passenger. That interpleader claim was filed by a lawyer retained for the Insureds by the Insurer — but who did not represent the Insurer — to defend the Insureds' interests. Around that time, a separate attorney who represented

---

Spencer were inside the basket at the time of their injuries. *See* J.A. 77. In pertinent part, the NTSB report states that, "[a]s the basket was secured, with the passengers still *inside*, the balloon draped over the powerlines and started to smoke." *Id.* at 79 (emphasis added). Although Davis and Spencer unsuccessfully moved to strike the NTSB report from the summary judgment record, they do not challenge that ruling on appeal.

[5] Another defendant sued by Davis and Spencer in the damages lawsuit was Mary Fisher, an additional insured under the Policy. The Maryland court dismissed her from the damages lawsuit in January 2019.

the Insurer offered to settle the damages lawsuit with Davis and Spencer for $100,000 per passenger, for a total payment of $200,000 to Davis and Spencer. That offer was rejected in April 2017, and Davis and Spencer took the position that Coverage A ($1,000,000 per occurrence) applied to their claims because they were not "passengers" in the balloon at the time of their injuries. In May 2018, Davis and Spencer demanded $999,999 from the Insureds (less than their position on coverage) to resolve their claims in the damages lawsuit. Before responding to that demand, the Insurer retained yet another lawyer as its coverage counsel.

In early June 2018, the coverage counsel for the Insurer wrote to Davis, Spencer, the Insureds, and their respective lawyers. *See* J.A. 768-75. That submission again presented the Insurer's position that the coverage limit provided by Coverage B (i.e., $100,000 per passenger) applied to Davis and Spencer individually. The Insurer therein rejected Davis and Spencer's position that they had exited the balloon's basket prior to the electric shock, explaining that the overwhelming evidence established that they were inside the basket at the time of their injuries. The Insurer also maintained, however, that even if Davis and Spencer had exited the balloon's basket before they were electrocuted, they were nevertheless "passengers" under the Policy. That is, because the Policy defined a "passenger" to include a person "alighting" from the balloon, Davis and Spencer were passengers in the balloon at the time of their injuries, because "they were unable [to] complete their alighting such that they safely moved away from the balloon and passed out of danger." *Id.* at 774. Coverage counsel's letter for the Insurer thus asserted that the

10

$100,000 per passenger limit provided in Coverage B — rather than the limit of $1,000,000 per occurrence, as provided by Coverage A — applies.

### D.

### 1.

As mentioned above, while the damages lawsuit was pending in the Maryland federal court, the Insurer, in June 2018, initiated these coverage proceedings against Davis, Spencer, and the Insureds in the Eastern District of Pennsylvania, seeking a declaration of the Policy's coverage limits. Upon motion of Davis and Spencer, the coverage litigation was transferred in November 2018 to the District of Maryland. In June 2019, the Maryland district court stayed the coverage litigation pending resolution of the damages lawsuit. Two months later, in August 2019, Davis and Spencer entered into a settlement agreement with the Insureds and resolved the damages lawsuit. The Insurer, however, was not a party to the settlement agreement and did not consent to the Insureds executing it. *See* J.A. 2048 (statement in settlement agreement that Insurer is "expressly exclud[ed]" from terms thereof). Pursuant to the settlement agreement, Fisher and New Horizon (jointly and severally) agreed to pay Davis and Spencer $11,700,000 plus interest, an amount that is collectable "solely and exclusively" by Davis and Spencer suing the Insurer. *Id.* at 2049.[6]

---

[6] In executing the settlement agreement in the damages lawsuit, the Insureds were, according to its provisions, "represented and advised by independent counsel" and "not the defense counsel retained by" the Insurer. *See* J.A. 2052. Moreover, as part of the settlement agreement, the Insureds assigned to Davis and Spencer all bad faith claims the Insureds might have against the Insurer. In these proceedings, Davis and Spencer pursue bad faith claims individually and as assignees of the Insureds.

After the damages lawsuit was settled and dismissed in August 2019, the district court lifted its stay of the coverage proceedings. In October 2019, the Insurer filed therein its amended complaint against Davis, Spencer, and the Insureds, in which the Insurer made new allegations triggered by the settlement agreement in the damages lawsuit. *See T.H.E. Ins. Co. v. Fisher*, No. 1:18-cv-03402 (D. Md. Oct. 18, 2019), ECF No. 60 (the "Complaint"). Like the coverage complaint filed in the Pennsylvania federal court in June 2018, the Complaint of October 2019 sought a declaration from the Maryland district court that

> [t]he $100,000 limit of liability for each passenger provided under Coverage B of the Policy is the maximum insurance coverage available under the Policy for the claims asserted against the [I]nsureds in the [damages lawsuit] and to indemnify the [I]nsureds for liability they have incurred to Davis and Spencer in the Judgment in the [damages lawsuit]. . . . Therefore, $200,000 is the maximum insurance coverage available under the Policy to indemnify the [I]nsureds for the Judgment in the [damages lawsuit].

*See* Complaint ¶¶ 61-62.

In November 2019, Davis and Spencer answered the Complaint and simultaneously lodged counterclaims against the Insurer for both contractual and statutory bad faith. The bad faith clams were pursued under Pennsylvania law, and were premised on the Insurer's investigation of the balloon accident and the settlement negotiations that had occurred in the damages lawsuit. In their contractual bad faith claim, Davis and Spencer alleged that, because the Insurer erroneously concluded that Coverage B applies, it acted in bad faith by refusing and failing to offer Davis and Spencer Coverage A's limit of $1,000,000 per occurrence. In their statutory bad faith claim, Davis and Spencer alleged, inter alia, that the Insurer's investigation of the balloon accident was unreasonable. They maintained that

12

there was no reasonable basis upon which the Insurer could have correctly concluded that Coverage B (i.e., the $100,000 per passenger limit) applies to Davis and Spencer.

2.

During discovery proceedings conducted in the coverage litigation, the parties developed evidence and a record regarding the hot air balloon accident. That included a 28-second video made by an eyewitness who had captured the balloon's crash into the farm field, along with initial efforts by the ground crew to secure the balloon. Unfortunately, neither Davis nor Spencer recalled any relevant details because of their injuries. For his part, pilot Fisher recalled that, after the electrical shock occurred, he found Davis and Spencer inside the balloon's basket. At his deposition, Fisher drew outlines of Davis and Spencer's bodies on a photograph of the balloon's basket after it had tipped over, indicating where Fisher saw Davis and Spencer at the time. Fisher's illustrations reflect that Davis's body (from the chest down) was inside the basket, and that Spencer's body (from the knees down) was also inside the basket. Meanwhile, Hart — the ground crew member present at the accident — confirmed the accuracy of Fisher's depictions, explaining that, after the balloon's basket tipped over and the electricity stopped "sparking," Davis and Spencer's bodies were "half in, half out" of the basket. *See* J.A. at 563-64.

3.

In January 2021, following the discovery proceedings, the Insurer sought summary judgment from the district court on the coverage issue, asserting that the $100,000 limit provided by Coverage B is applicable to Davis and Spencer, in that they were inside the balloon's basket at the time of their injuries and thus were "passengers" under the Policy.

13

Alternatively, the Insurer maintained that, even if Davis and Spencer were outside the basket at the time of their injuries, they were nevertheless "passengers" because they were "alighting from" the balloon. The Insurer also requested summary judgment on the Pennsylvania bad faith claims, arguing that they each fail because the $100,000 per passenger coverage limit provided by Coverage B is controlling.

For their part, Davis and Spencer opposed the Insurer's summary judgment requests on the coverage issue and on the bad faith claims. They also moved for a summary judgment award on their behalf on the Insurer's coverage claim, resting their position solely on res judicata grounds. Opposing summary judgment on the bad faith claims, Davis and Spencer maintained that the Insurer's request fails as a matter of Pennsylvania law because it failed to conduct a reasonable investigation of the balloon accident, and that the Insurer failed to reasonably conclude that the $100,000 per passenger limit provided by Coverage B applies. On the coverage issue, Davis and Spencer argued that, applying federal law principles of res judicata, they were entitled to a summary judgment award that Coverage A and its $1,000,000 limit applies because the coverage claim of the Insurer is barred by the settlement agreement in the damages lawsuit.

In addition to their res judicata contention on the coverage issue, Davis and Spencer maintained that material and disputed issues of fact exist in the discovery record and that a jury trial is necessary to decide whether they were "passengers" or "non-passengers" under the Policy. In support thereof, Davis and Spencer secured and presented an expert witness report by a professional engineer named Sommer, who was trained and experienced in aircraft accident investigations (the "Sommer report"). Davis and Spencer asserted that the

14

Sommer report supports their contention that they were outside the balloon's basket and not balloon "passengers" at the time of their injuries, and that Coverage A's limit of $1,000,000 per occurrence applies. The Sommer report opined that Davis and Spencer "were exiting the basket after the completion of the flight and the subsequent upset of the basket." *See* J.A. 2178. The report also opined that, prior to suffering from electrical shock, Davis and Spencer had "crawled out of the basket and the area of the balloon after the basket fell to its side." *Id.* at 2179.

In March 2021, the Insurer moved to strike the Sommer report, maintaining that it failed to comport with Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) (establishing standard for admissibility of expert testimony under Rule 702). According to the Insurer, the Sommer report is inadmissible as expert testimony because it is not based upon evidence in the record — that is, there is no evidence to support Sommer's assumption that Davis and Spencer were outside the balloon's basket at the time of their injuries. The Insurer maintained that, in any event, Sommer was not qualified to provide expert testimony that the electrical shock suffered by Davis and Spencer caused their injuries.

4.

By its Memorandum Opinion of August 2021, the district court ruled in favor of the Insurer on the coverage issue and rejected Davis and Spencer's bad faith claims. At the outset, however, the Memorandum Opinion assessed and granted the Insurer's motion to strike the Sommer report. The court ruled that the Sommer report "erroneously relied on the assumption that Davis and Spencer had exited, crawled out of, or egressed to extricate

15

themselves from the basket before the electrical shock." *See* Memorandum Opinion 15 (internal quotation marks omitted). According to the court, there is "no evidence in the record" to support the proposition set forth in the Sommer report that Davis and Spencer were outside the basket at the time of their injuries. *Id.* The court also ruled that "Sommer is not qualified to provide expert testimony on electrical engineering, electrical conductivity, or electrical shock injuries," insofar as he "does not have [an] advanced degree, professional training, or any expertise in electrical engineering." *Id.* at 16-17.

Turning next to the Insurer's coverage claim, the Memorandum Opinion ruled that res judicata does not bar the coverage claim because the Insurer was not in privity with the Insureds for purposes of the settlement agreement in the damages lawsuit. Applying federal law principles of res judicata, the district court recognized that the Insurer's request for declaratory judgment is not based upon the same cause of action as the interpleader claim filed by the Insureds in the damages lawsuit. As the court explained,

> no court has been presented with evidence and argument in order to decide whether Coverage A or Coverage B applies. Thus, it cannot be said that the [coverage issue] has already been decided or that [the Insurer] has previously had a fair shot with respect to the claims raised in the present action. . . . [D]ismissing the [coverage] claim as res judicata would leave unanswered the critical question of whether Coverage A or Coverage B applies, leaving the parties no closer to resolving this dispute than they were at the beginning of this litigation.

*See* Memorandum Opinion 25 (internal quotation marks omitted).

The Memorandum Opinion resolved that, under the Policy, Coverage B's limit of $100,000 per passenger applies to Davis and Spencer individually. As the district court related, "Davis and Spencer were 'passengers' under the Policy at the time of their

16

injuries." *See* Memorandum Opinion 26. In reaching that conclusion, the court explained that Davis and Spencer disputed only whether they were actually "passengers" at the time of their injuries. *Id.* The court deemed it controlling that Davis and Spencer's assertion that they were "not in the basket at the time they suffered the electric shock" was "not supported by the facts in the record." *Id.* at 28. The undisputed fact, in the court's view, was that Davis and Spencer were inside the basket at the time of their injuries.

Its conclusion on the foregoing point notwithstanding, the Memorandum Opinion addressed the Insurer's alternative argument that, irrespective of whether Davis and Spencer were inside or outside the balloon's basket at the time of the electrical shock, they were then and there "alighting from" the balloon, thus rendering them "passengers" under the Policy. *See* Memorandum Opinion 30. On that score, the district court recognized that, although the term "alighting" is not defined in the Policy, it "is reasonably construed to mean that a person's status as a 'passenger' does not change merely because the balloon has reached the ground or the person has stepped foot out of the basket." *Id.* Consulting Pennsylvania law, the court ruled that Davis and Spencer were "'passengers' under the Policy even if they had been ejected from the basket or exited . . . on their own volition before being injured by the electrical shock." *Id.* at 34.

Moving on, the Memorandum Opinion disposed of Davis and Spencer's bad faith claims. On the contractual bad faith claim, the district court concluded that, under the correct interpretation of the Policy — Davis and Spencer were "passengers" at the time of their injuries — "[the Insurer] had no contractual or fiduciary obligation to offer more than

17

the . . . Coverage B limit[].” *See* Memorandum Opinion 39. Disposing of Davis and Spencer's statutory bad faith claim, the court related that it is

> inextricably tied to their claim that [the Insurer] improperly refused to make or accept a settlement offer consistent with Coverage A's limits. But [the Insurer's] refusal to do so was not unreasonable because Coverage B applies to Davis and Spencer's claims. Because there was a reasonable basis for determining that Coverage B applied to Davis and Spencer's claims, Davis and Spencer's [statutory] bad faith claim . . . fails as a matter of law.

*Id.* at 41. The court then concluded that, in any event, "Davis and Spencer cannot demonstrate by clear and convincing evidence that [the Insurer] failed to conduct an adequate investigation into the [balloon accident]." *Id.* at 42.

By separate order of August 19, 2021, the district court awarded judgment to the Insurer on its coverage claim, concluding that Coverage B of the Policy — $100,000 per passenger — is applicable to Davis and Spencer. The court's order likewise awarded judgment to the Insurer on the bad faith claims. Davis and Spencer timely noted this appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

We review an award of summary judgment de novo. *See Hawkspere Shipping Co., Ltd. v. Intamex, S.A.*, 330 F.3d 225, 232 (4th Cir. 2003). Summary judgment is appropriate when — viewing the facts in the light most favorable to the nonmoving party — the movant shows that "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *See FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). To the extent that "cross-motions for summary judgment

18

are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *See Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021) (internal quotation marks omitted). Moreover, "[w]e review de novo a district court's application of the principles of res judicata." *See Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004). And our review of a district court's decision on an issue of contract interpretation (i.e., an insurance policy) is also de novo. *See Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013).

Meanwhile, a district court's decision to exclude the evidence of a proposed expert is reviewed for abuse of discretion. *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997)). "A district court abuses its discretion if its conclusion is guided by erroneous legal principles . . . or rests upon a clearly erroneous factual finding." *Id.* (internal quotation marks omitted). That is, a court's ruling concerning the admissibility of opinion evidence should only be reversed if there is a "definite and firm conviction that the court . . . committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *See EEOC v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015) (internal quotation marks omitted).

III.

Appellants Davis and Spencer present two primary appellate challenges with respect to the judgment of the district court. First, they contend that the court erred in awarding summary judgment to the Insurer on its coverage claim. In that regard, Davis and Spencer

initially assert that, applying the doctrine of res judicata, the Insurer's coverage claim is barred by the settlement agreement executed in the damages lawsuit. That proposition notwithstanding, they take issue with the court's interpretation of the Policy's applicable coverage limits. More specifically, Davis and Spencer contend that, in light of the Sommer report, a genuine dispute of material fact exists as to whether they were "passengers" under the Policy at the time of their injuries, and that a jury trial is warranted, thus precluding judgment as a matter of law in the Insurer's favor.

Second, Davis and Spencer argue that the district court erroneously awarded summary judgment to the Insurer on their bad faith claims. On the contractual bad faith claim, they maintain that, because the court incorrectly ruled that the $100,000 coverage limit provided by Coverage B of the Policy applies, the Insurer necessarily acted in bad faith by failing to offer a settlement consistent with the coverage limit of $1,000,000 per occurrence, as provided by Coverage A. As to the statutory bad faith claim, Davis and Spencer assert, inter alia, that the court erroneously failed to conclude that the Insurer conducted an unreasonable investigation of the balloon accident.

We will assess those contentions in turn.

A.

We first dispose of Davis and Spencer's contention that the district court erred in awarding summary judgment to the Insurer on the coverage claim. We begin by assessing the proposition that the coverage claim is barred by res judicata. We then assess whether the court correctly decided that Davis and Spencer were "passengers" under the Policy at the time of their injuries, and that Coverage B's limit of $100,000 per passenger applies.

20

1.

Davis and Spencer first argue that the district court should have made an award of summary judgment in their favor because the Insurer's coverage claim is barred by res judicata, which presents a question that we review de novo. *See Pueschel*, 369 F.3d at 354. As Davis and Spencer see it, the settlement agreement made and executed in the damages lawsuit resolved the coverage issue presented in these proceedings.

As a preliminary matter, we must identify the legal principles that govern our res judicata analysis. The district court concluded — as the parties maintain in this appeal — that federal law applies in ascertaining the preclusive effect of the settlement agreement in the damages lawsuit. We disagree. Under controlling precedent, Maryland law controls a determination of the preclusive effect, if any, of the settlement. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497 (2001); *Q Intern. Courier Inc. v. Smoak*, 441 F.3d 214 (4th Cir. 2006). That is, when a prior federal action "based on diversity jurisdiction" has been "adjudicated in [a] federal district court . . . [u]nder *Semtek*, the preclusive effect, if any, of the [prior federal court] action should . . . be[] decided under the res judicata law of the state" in which the court was located. *See Q Intern.*, 441 F.3d at 218.

The damages lawsuit was filed by Davis and Spencer in the District of Maryland, pursuant to diversity jurisdiction. We are thus obliged to apply Maryland principles of res judicata to ascertain the preclusive effect of those proceedings. In Maryland, "the elements of res judicata are: (1) that the parties in the present litigation are the same or in privity with the parties in the earlier dispute; (2) that the claim presented in the current action is identical to the one determined in the prior adjudication; and (3) that there has been a final

judgment on the merits." *See Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 162 (4th

Cir. 2008) (citing *Anne Arundel Cnty. Bd. of Educ. v. Norville*, 887 A.2d 1029, 1037 (Md.

2005)).[7]

Against this backdrop of Maryland legal principles, we are satisfied that res judicata

does not bar the coverage issue pursued by the Insurer in these proceedings. First off, the

Insurer was not a party in the damages lawsuit. That point notwithstanding, the Insurer's

coverage claim is not identical to the Insured's interpleader claim in the damages lawsuit,

which was dismissed under the terms of the settlement agreement. In that regard, "no court

has been presented with evidence and argument in order to decide whether Coverage A or

Coverage B applies." *See* Memorandum Opinion 25 (internal quotation marks omitted).

Furthermore, the settlement agreement does not constitute a final judgment on the merits

of the legal questions at issue in the coverage proceedings. As the district court recognized,

"while the [settlement agreement] and Order dismissing the [damages lawsuit] constitute

final judgments, they do not operate as final judgments as to . . . whether Coverage A or

Coverage B applies." *Id.* at 25-26. That is, "although the [settlement agreement]

extinguished Davis and Spencer's claims against the Insureds, it did not resolve the

*separate* question of the extent of coverage under the [Insurer's] Policy." *Id.* at 26

---

[7] Although the district court mistakenly applied federal principles of res judicata, *see* Memorandum Opinion 23-24, we observe that the elements of res judicata under federal law are substantially identical to those required by Maryland law. That is, pursuant to federal law, res judicata applies when: "(1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of the parties or their privies in the two suits." *See SAS Inst. Inc. v. World Programming, Ltd.*, 874 F.3d 370, 378 (4th Cir. 2017) (internal quotation marks omitted).

(emphasis added). And perhaps most notably, the settlement agreement does not — by its terms — contemplate that the dismissal of the Insured's interpleader claim in the damages lawsuit will impact the coverage issue presented here.

Moreover, that the settlement agreement in the damages lawsuit does not bar the Insurer's coverage claim is consistent with Maryland's preference that insurers should not inject themselves into tort liability cases that have been lodged against their insureds. *See Brohawn v. Transamerica Ins. Co.*, 347 A.2d 842 (Md. 1975) (ruling that insurer can seek declaratory judgment on coverage issue prior to trial involving its insured only where coverage issue is "independent and separable"); *Allstate Ins. Co. v. Atwood*, 572 A.2d 154, 159-60 (Md. 1990) (recognizing that "it is inappropriate for the insurer to intervene in the trial of the tort suit against its insured"). As the Maryland high court explained in its *Atwood* decision, declaratory actions initiated by insurers are only appropriate in circumstances where there are questions that are "independent and separable" from claims asserted by an injured third party in a tort liability suit. *See Atwood*, 572 A.2d at 252. And that principle includes "question[s] of coverage or defenses under the language or requirements of the insurance policy" that are "separate and distinct from the issues" presented in the liability proceedings. *See St. Paul Fire & Marine Ins. Co. v. Pryseski*, 438 A.2d 282, 286 (Md. 1981).

Applying Maryland principles of res judicata in this dispute, we are satisfied that the coverage issue presented by the Insurer in these proceedings is not barred by the settlement agreement in the damages lawsuit. As such, we agree with the district court that

23

Davis and Spencer are not entitled to a summary judgment award on the coverage issue on res judicata grounds.

### 2.

Next, Davis and Spencer maintain that the district court erred in its interpretation of the Policy's applicable coverage limits, as set forth in Coverage A and Coverage B. Our review of this issue presents a question of law concerning the Policy's provisions, which we assess de novo. *See Perini/Tompkins*, 738 F.3d at 101. In that regard, the parties agree that Pennsylvania law applies to our interpretation of the Policy.

Davis and Spencer maintain that, because they were not balloon "passengers" at the time of their injuries, the coverage limit of $1,000,000 per occurrence — as provided by Coverage A of the Policy — applies here. Accepting either party's asserted view of the facts, however — as the district court recognized — Davis and Spencer were "passengers" under the Policy. Thus, the $100,000 per passenger coverage limit provided by Coverage B is controlling.

### a.

First of all, we have no disagreement with the view of the district court and the Insurer that Davis and Spencer were both inside the balloon's basket at the time of their injuries. The Policy defines a "[p]assenger" as "any person, other than the 'pilot in command', *in* or entering the 'Hot Air Balloon' for the purpose of riding therein or alighting therefrom following a flight or attempted flight, or a crew member." *See* J.A. 48 (emphasis added). On this record — and accepting the facts in the light most favorable to Davis and Spencer — the district court correctly ruled that Davis and Spencer were inside

24

the balloon's basket when they were injured. Pilot Fisher and ground crew member Hart confirmed that Davis and Spencer's bodies were substantially inside the basket after the accident. In fact, Fisher and Hart each saw Davis and Spencer partially inside the tipped-over basket during and after the electric shock. The NTSB report also concluded that Davis and Spencer were "inside" the balloon's basket when they were injured. *Id.* at 79.[8]

The district court thus did not err in ruling that Davis and Spencer were inside the balloon's basket at the time of their injuries. As such, Davis and Spencer were "passengers" under the Policy and Coverage B's limit of $100,000 per passenger applies.

b.

Our conclusion on that point notwithstanding, Davis and Spencer contend that, because they presented evidence that they were outside the balloon's basket at the time of their injuries, they were not "passengers" under the Policy. As a result, they assert that Coverage A's limit of $1,000,000 per occurrence is applicable. Davis and Spencer

---

[8] Davis and Spencer maintain that additional evidence supports the proposition that, at the very least, Davis was outside the balloon's basket at the time of her injuries. More specifically, Davis and Spencer point to a February 2018 memorandum prepared by the Insureds' lawyer in the damages lawsuit. That memorandum recounts a conversation that the Insureds' lawyer had with pilot Fisher, during which Fisher represented that Davis was outside the balloon's basket right after it tipped over. Davis and Spencer thus argue that Fisher's out-of-court statement — which is inconsistent with Fisher's prior and subsequent statements about the accident — creates a factual dispute regarding whether Davis was inside the balloon's basket when she was electrocuted. As discussed below, however, even assuming that Fisher's statement is evidence that can appropriately be considered at the summary judgment stage, that fact is immaterial as to whether Davis was a "passenger" under the Policy at the time of her injuries. *See infra* Part III.A.2.b.

25

specifically emphasize the Sommer report, and argue that it creates a genuine dispute of material fact as to whether they were "passengers" at the time of their injuries.

i.

On that contention, Davis and Spencer challenge the district court's ruling that the Sommer report is inadmissible under Rule 702 of the Federal Rules of Evidence and Supreme Court precedent. Again, we review such an evidentiary ruling for abuse of discretion. *See Westberry*, 178 F.3d at 261. Specifically, Davis and Spencer maintain that the Sommer report is admissible as expert testimony and supports the proposition that they were outside of the balloon's basket at the time of their injuries. Federal Rule of Evidence 702 governs the admissibility of expert opinion, and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

*See* Fed. R. Evid. 702. Pursuant to the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), a district court "must ensure that the expert is qualified and that the expert's testimony is both relevant and reliable." *See United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019) (citing *Daubert*, 509 U.S. at 589). That

26

is, a court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *See Daubert*, 509 U.S. at 597.

In these circumstances, the district court did not abuse its discretion in granting the motion of the Insurer to strike the Sommer report. Although we refrain from deciding whether Sommer is qualified to provide such expert testimony, it is clear that his report erroneously "relied on the assumption that Davis and Spencer had exited, crawled out of, or egressed to extricate themselves from the [balloon's] basket before the electrical shock." *See* Memorandum Opinion 16 (internal quotation marks omitted). More specifically, there is no "reliable foundation" — on this record or otherwise — that supports the Sommer report's flawed assumption that Davis and Spencer were outside the balloon's basket at the time of their injuries. *See Daubert*, 509 U.S. at 597. We are thus entirely unable to possess a "definite and firm conviction" that the court "committed a clear error of judgment" in striking the Sommer report. *See Freeman*, 778 F.3d at 466 (internal quotation marks omitted).

ii.

Nevertheless, if we were to accept the Sommer report's assumption that Davis and Spencer were outside the balloon's basket at the time of their injuries, they would still be "passengers" under the Policy, in that they were "alighting [from the balloon] following a flight." *See* J.A. 48. We therefore agree with the district court in that regard.

To briefly explain, because "the term 'alighting' is not defined in the Policy," we use Pennsylvania law — which the parties agree controls — and apply that term "according to its ordinary meaning." *See* Memorandum Opinion 30 (citing *Dull v. Emp'rs Mut. Cas.*

27

*Co.*, 420 A.2d 688, 690 (Pa. Super. Ct. 1980)).    Under the applicable legal principles, "[c]lear policy language . . . is to be given effect, and courts should not torture the language to create ambiguities but should read the policy provisions to avoid it."  *See Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n.3 (3d Cir. 1998) (quoting, inter alia, *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)).

The district court construed the term "alighting" as meaning "to come down from something (such as a vehicle), i.e., to dismount or deplane."  *See* Memorandum Opinion 30 (internal quotation marks omitted).  According to the court,

> the Policy is reasonably construed to mean that a person's status as a 'passenger' does not change merely because the balloon has reached the ground or the person has stepped foot out of the basket.

*Id.*    And the court's construction of the term "alighting" is supported by analogous Pennsylvania law addressing when an individual is no longer a "passenger" in an automobile.  In that context, the Pennsylvania courts have ruled that an individual continues to "occupy" a vehicle even after being ejected or removed from it, *see Allstate Fire & Cas. Ins. Co. v. Hymes*, 29 A.3d 1169, 1171-73 (Pa. Super. Ct. 2011), so long as the individual remains "vehicle oriented," *see Tyler v. Ins. Co. of N. Am.*, 457 A.2d 95, 97 (Pa. Super. Ct. 1983) (concluding that passenger who exited bus and was struck by motorcycle while walking to sidewalk remained "vehicle oriented" and was yet an "occupant" of bus); *Knoud v. Galante*, 696 A.2d 854, 856 (Pa. Super. Ct. 1997) (same).

Applying Pennsylvania legal principles to this situation — and assuming that Davis and Spencer were outside the balloon's basket at the time of their injuries — they were nevertheless "oriented" to the balloon and were in the process of "alighting" therefrom.  As

28

a result, even if Davis and Spencer were partially or completely outside the balloon's basket at the time of their injuries, they were "passengers" under the Policy and Coverage B's limit of $100,000 per passenger is applicable.

* * *

At bottom, the district court properly awarded summary judgment on the coverage claim in favor of the Insurer's contention that the Coverage B limit of $100,000 per passenger applies to Appellants Davis and Spencer. Put most succinctly, there is no genuine dispute of material fact with respect to whether they were "passengers" under the Policy, regardless of whether they were inside the hot air balloon's basket — or just outside of the balloon's basket — at the time of their injuries.

### B.

Having disposed of the coverage claim in favor of the Insurer, we must assess whether the district court correctly awarded summary judgment to the Insurer on Davis and Spencer's bad faith claims. We review those rulings de novo. *See Hawkspere*, 330 F.3d at 232. Applying Pennsylvania law, we are satisfied that the court properly so ruled.

### 1.

As to the contractual bad faith claim, Davis and Spencer maintain that, because the district court erroneously ruled that Coverage B of the Policy applies to Davis and Spencer individually, their contractual bad faith claim must prevail as a matter of law. In the Keystone State, "insurers have a contractual duty to act in good faith when making decisions to settle." *See Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 237 (3d Cir. 2003) (internal quotation marks omitted). That is so because "an insurer assumes a fiduciary

29

responsibility towards its insured and therefore is obligated to act in good faith and with due care when it represents the interests of the insured when dealing with third-party claims brought against the insured." *Id.* (internal quotation marks omitted).

The Supreme Court of Pennsylvania has recognized that "the insurer must accord the interest of its insured the same faithful consideration it gives its own interest." *See Cowden v. Aetna Cas. & Sur. Co.*, 134 A.2d 223, 227 (Pa. 1957). But an insurer is not required to "submerge its own interest in order that the insured's interest may be made paramount." *Id.* at 228. That is, when an insurer is defending its insured against a third party's liability claim, the insurer's fiduciary obligation is limited to settling the claim "within policy limits." *See Birth Ctr. v. St. Paul Cos., Inc.*, 787 A.2d 376, 379 (Pa. 2001) (recognizing that "[w]here an insurer refuses to settle a claim that could have been resolved within policy limits without 'a bona fide belief . . . that it has a good possibility of winning,' it breaches its contractual duty to act in good faith and its fiduciary duty to its insured" (quoting *Cowden*, 134 A.2d at 229)).

Here, Davis and Spencer's contractual bad faith claim rests on the notion that Coverage A of the Policy — that is, $1,000,000 per occurrence — applies to their injury claims. As the district court explained, "the premise of Davis and Spencer's contractual bad faith claim is that, because Coverage A applied to their claims against the [i]nsureds, [the Insurer] breached its fiduciary duty when it failed to settle within the limits of Coverage A." *See* Memorandum Opinion 39. Because the court did not err in ruling that Coverage B (i.e., $100,000 each) applies in this dispute, however, "[the Insurer] had no contractual or fiduciary obligation to offer more than the applicable Coverage B limits."

30

*Id.* (citing *Birth Ctr.*, 787 A.2d at 379).  That is, because the Insurer repeatedly offered Coverage B's limit of $100,000 per passenger to settle the damages lawsuit, the Insurer "did not fail to settle the claims for an amount within the applicable limits." *Id.*  The court thus did not err in awarding judgment to the Insurer on the contractual bad faith claim.

2.

Finally, Davis and Spencer challenge the district court's treatment of their statutory bad faith claim.  *See* 42 Pa. C.S.A. § 8371.  Pursuant to Pennsylvania law, a statutory bad faith claim against an insurer is authorized when "[i]n an action arising under an insurance policy, . . . the court finds that the insurer has acted in bad faith toward the insured." *Id.* As the Pennsylvania high court has recognized, "to prevail in a [statutory] bad faith insurance claim pursuant to Section 8371, a plaintiff must demonstrate, by clear and convincing evidence, (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *See Rancosky v. Wash. Nat'l Ins. Co.*, 170 A.3d 364, 376 (Pa. 2017).

Of importance, a statutory bad faith claim under Pennsylvania law must be supported by more than "mere negligence or bad judgment." *See Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1994).  That a plaintiff must prove the insurer's bad faith by "clear and convincing" evidence means that the plaintiff must show "that the evidence is so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the [insurer] acted in bad faith." *See J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d. Cir. 2004) (internal quotation

31

marks omitted).  Still, under Pennsylvania law, "an insurer may defeat a claim of bad faith by showing . . . a reasonable basis for its actions."  *See Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 179 (3d Cir. 2011) (internal quotation marks omitted).

Some additional Pennsylvania legal principles are relevant here.  For example, although a Pennsylvania statutory bad faith claim has a broader reach than a contractual bad faith claim, *see Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999), "there can be no [statutory] bad faith claim for denial of coverage if the insurer was correct as a matter of law in denying coverage," *see Wehrenberg v. Metro. Prop. & Cas. Ins. Co.*, 715 F. App'x 209, 213 (3d Cir. 2017) (citing *Frog, Switch & Mfg. Co.*, 193 F.3d at 751 n.9).  Even so, in "exceedingly rare" circumstances, an insurer may act in bad faith by failing to conduct a reasonable investigation.  *See Gallatin Fuels Inc. v. Westchester Fire Ins. Co.*, 244 F. App'x 424, 435 (3d Cir. 2007).

In these circumstances, we are readily satisfied that Davis and Spencer's statutory bad faith claim is without merit.  As the district court emphasized, "Davis and Spencer's claim for bad faith is inextricably tied to their claim that the Insurer improperly refused to make or accept a settlement offer consistent with Coverage A's limits."  *See* Memorandum Opinion 41.  In that sense, Coverage B ($100,000 per passenger) applies to both Davis and Spencer.  Accordingly, the Insurer's failure to tender a settlement offer to Davis and Spencer consistent with a coverage limit of $1,000,000 cannot be unreasonable.

Nor does this situation present the "exceedingly rare" circumstance where Davis and Spencer's statutory bad faith claim stands independently based upon the Insurer's failure to conduct a reasonable investigation.  *See Gallatin Fuels*, 244 F. App'x at 435.  For

32

example, the Insurer's senior claims specialist interviewed pilot Fisher five days after the accident. That discussion led the Insurer to conclude that Davis and Spencer were inside the balloon's basket at the time of their injuries. And that conclusion is well supported by the NTSB report — i.e., that Davis and Spencer were "inside" the basket at the time of their injuries. *See* J.A. 79.

Although the Insurer presented "substantial proof that Davis and Spencer were inside the basket at the time of their injuries," that fact is largely immaterial to the statutory bad faith claim, inasmuch as "[the Insurer] reasonably concluded that [Davis and Spencer's] precise locations at the time of the electric shock were irrelevant to whether Coverage A or Coverage B applied." *See* Memorandum Opinion 43. In these circumstances, the district court did not err in awarding judgment to the Insurer on the statutory bad faith claim. *Id.*

## IV.

Pursuant to the foregoing, we reject the various contentions of error and affirm the judgment of the district court.

*AFFIRMED*

33